**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF TEXAS**
**BEAUMONT DIVISION**

| | | |
|---|---|---|
| **FRANK DRAPELA,** | § | |
| | § | |
| ***Plaintiff,*** | § | |
| | § | |
| **v.** | § | **CIVIL ACTION NO. 1:08-CV-44-TH** |
| | § | |
| **THE UNITED STATES OF AMERICA,** | § | |
| | § | |
| ***Defendant.*** | § | |

## FINAL JUDGMENT

The Court conducted a two-day bench trial in this civil action, beginning February 23, 2009. On May 22, 2009, the Court issued a memorandum opinion and partial judgment, wherein it found that the discretionary function exception defense asserted by the government did not apply in this case. [Clerk's Docket No. 60]. Having considered the testimonial and documentary evidence presented by both parties, the arguments of counsel, and the applicable law, the Court now enters its findings of fact and conclusions of law pursuant to Rule 52 of the Federal Rules of Civil Procedure. To the extent that any findings of fact made below are deemed to be conclusions of law, they should be so considered. Likewise, to the extent that any conclusions of law are deemed to be findings of fact, they should also be so considered.

## INTRODUCTION

Plaintiff Frank Drapella ("Plaintiff" or "Drapella") alleges that he suffered serious spine injuries while employed as a seaman on the government-owned vessel the M/V CAPE VICTORY. He alleges his injuries were caused by the United States' negligence in installing D-Rings without

grease fittings and, when those D-rings "froze" from exposure to salt water, in requiring Drapella laboriously dislodge the rings with inadequate supplies or assistance. He further alleges that the M/V CAPE VICTORY was unseaworthy for the same reasons and that the unseaworthiness of the vessel was the proximate cause of his injuries.

## FINDINGS OF FACT

The M/V CAPE VICTORY is a government-owned vessel assigned to the Ready Reserve Force, a component of the National Defense Reserve Fleet. It is a public vessel under the control of the Maritime Administration ("MARAD"). At all relevant times, the ship was managed by Keystone Shipping Services, Inc.("Keystone"). At the time of the incident, the M/V CAPE VICTORY was moored alongside a pier in Beaumont, Texas.

Drapella was born on November 15, 1947. He joined the U.S. Navy on September 19, 1966 and was discharged on June 1, 1970. Almost all of his working career since that date has been at sea. Drapella became the permanent bosun of the M/V CAPE VICTORY in September 1998 and continued in that role until he was injured. A bosun is the senior unlicensed member of a ship's crew. Drapela's work while the vessel was in reserve status was to maintain everything on the vessel outside the engine room. There were only two workers in the deck department when the ship was in reserve: Drapella, as bosun, and Seaman Stig Sasse ("Sasse") who worked under his supervision. As bosun, Drapela would routinely chip, paint and clean the exterior of the M/V CAPE VICTORY. He would occasionally use a sledge hammer during the course of his duties. Chief Mate Kevin Brooks ("Brooks") was the chief mate of the M/V CAPE VICTORY in February 2007. When the vessel goes to sea, he sails as its captain. Brooks first went to sea as an officer in 1980. When the vessel is in port, he is in charge of maintenance on the vessel and ensuring its ability to go to sea if required by the military.

In 2003, the M/V CAPE VICTORY was deployed to support Operation Iraqi Freedom. It transported Army equipment, such as tanks and helicopters. These were loaded and secured using the existing lashing pockets, a kind of tie-down that was located throughout the cargo decks. During that operation, it became apparent there were too few lashing pockets positioned around the perimeters of the M/V CAPE VICTORY cargo areas. As a result, the cargo had to be placed in a manner that severely limited access. The Port Engineer, Richard Tammaro ("Tammaro") decided to have "D-rings" installed. He hired a private contractor to install 165 D-rings around the perimeters of the cargo areas of the M/V CAPE VICTORY. Over time, through inactivity and exposure to salt water and wind, the majority of these D-rings rusted and "froze." D-rings are a normal item to see on ships. It is common knowledge that they rust if exposed to the maritime environment without additional measures taken to prevent that rust. Brooks knew this about D-rings.

In February 2007, Drapela observed to Brooks that the D-rings were frozen. Brooks replied that Drapela "knew what to do." Drapela took this to mean he knew he should begin trying to loosen the D-rings through physical force. Drapela used a sledgehammer and a crowbar to loosen the D-rings. He chose these supplies from a supply closet on the ship and testified he used them because they were the only tools available. To loosen a D-ring, Drapela would pound it on different sides with the sledgehammer. After a period of this beating, the ring would gradually begin to move from side to side. Then Drapela would take the crowbar and use it to pry the rings up to about a thirty degree angle. He would then continue to use the sledge hammer to loosen the ring until it was loose enough to work free with his hands. He would sporadically blast the rust and use a sharpened welding rod to pry some of the rust loose. It was grueling labor. Drapela worked a full day on loosening the D-rings on Monday, February 5, 2007, a half-day on Tuesday, February 6, 2007 and another full day on Wednesday, February 7, 2007. He loosened roughly eighty rings during those two and a half days. On Thursday, February 8, 2007 Drapela woke up with severe pain in his forearm, head and neck. He could not move two of his fingers in his right arm. He went to work

that morning and reported the injury. Brooks had another crew member drive Drapela to the Tower Medical Center in Nederland, Texas. Drapela was declared unfit for duty following a medical examination. Drapela then went to see Dr. Stephen Esses, an orthopedic specialist, who ordered an MRI. Dr. Esses reviewed the MRI and found significant spinal cord compression. He observed bulging disks, ligament hypertrophy and foraminal narrowing at C3, 4, 5, 6, and 7. Dr. Esses ordered an epidural steroid injection. The injection did not help Drapela's pain. Dr. Esses then ordered an EMG. An EMG is a test that allows a doctor to deduce how a nerve is functioning. The EMG confirmed that Drapella's C-6 nerve root was not functioning normally. After reviewing the results of the EMG, Dr. Esses discussed surgical options with Drapela. Drapela opted for the surgery as he remained in serious pain. On April 13, 2007, Drapela underwent spinal surgery. After surgery, Drapela applied for social security disability benefits, for which he was approved. He has received, and continues to receive, maintenance payments of $8.00 a day. The surgery relieved the constant pain in Drapela's arm but the pain has been replaced by numbness. His neck is stiff much of the time. If he exerts himself physically, his pain flares. Activities like leaning over, trying to work above his head with his hands, or cleaning shrimp cause him pain and headaches. Drapela testified that he feels depressed because he cannot go to sea anymore, after spending his entire adult life working on vessels. He misses the companionship of his fellow seamen. Drapela has seen a psychiatrist at the Veterans Administration. The psychiatrist prescribed an anti-depressant.

Drapela's treating physician was Dr. Esses. He is an eminently qualified spine surgeon. He has authored over 100 articles dealing with spine surgery and related topics. He has published a single author book called "Textbook of Spinal Disorders" which is a standard reference book used in residency training. He is board-certified by the American Board of Orthopedic Surgeons and American Board of Spine Surgeons. In Dr. Esses' opinion, there is a medical connection between Drapela's loosening of the D-rings and the injuries to his spine. He testified that repeated activity that stresses the neck can either cause or exacerbate problems in the spine. Drapela received physical therapy for a year following his surgery. On April 14, 2008, he had a one year, post-operative

follow-up exam with Dr. Esses. Drapela still had occasional numbness in his right hand and a limitation of 45 degrees of axial rotation, to the right or to the left, in his neck. Dr. Esses testified that these were normal results. Dr. Esses testified that Drapela should have annual evaluations consisting of a physical examination and x-rays of his injured spine. On occasion, Drapela's pain will require prescription medication.

Dr. James Mandel is an economic expert. He has a PhD in accounting and has taught at the University of Texas, Houston Baptist University, University of St. Thomas and Rice University. He has thirty years of academic experience. His doctoral dissertation was on evaluation and he has worked for the United States Government on several occasions to provide accounting evaluations. Dr. Mandel reviewed Drapela's tax returns, fringe benefits, social security information and personal demographics. He testified that Drapela's past losses from the date of his injury to the date of trial, after the removal of taxes, is a net loss of $142, 992.00. He tetified that Drapela's net future lost earnings is $281,234.00, after deducting income taxes and discounting to present value. Dr. Mandel based his average wage on Drapela's actual average wage from 2001 through and including 2007, accounting for Drapela's absences while receiving treatment for prostate cancer. Dr. Mandel found his average wage to be $66,790.00. Dr. Mandel presumed that Drapela's fringe benefits would be the same percentage as others in his position within the industry. He assumed that Drapela's pay increases from the time of the injury into the present and growth rate would be $0.00. Dr. Mandel evaluated the net value of meals Mr. Drapela would have received on the ship and found the total discounted past and present value of $43,824.00. Dr. Mandel used Dr. Esses' testimony to predict the total cost of future medical treatment over Drapela's lifetime to be $7,940.00.

## II. Conclusions of Law

### A. Jurisdiction

The Court concludes this is a case of admiralty and maritime jurisdiction against the United States pursuant to the general maritime law of the United States; the Jones Act, 46 U.S.C.

§§ 30104, 30105 and 30106; the Suits in Admiralty Act, 46 U.S.C. § 745; the Public Vessels Act; 46 U.S.C. § 781; the Clarification Act, 50 U.S.C. App. § 1291; and, is properly before the Court under Rule 9(h) of the Federal Rules of Civil Procedure.

**B. Negligence Under the Jones Act**[1]

A negligence claim under the Jones Act requires a finding both of negligent breach of duty and proximate cause. *Gavagan v. United States*, 955 F. 2d 1016, 1020, n. 6 (5th Cir. 1992). The negligence must have been a substantial factor in bringing about the plaintiff's harm. *Spinks v Chevron Oil Co.*, 507 F. 2d 216, 223 (5th Cir. 1975). The standard of care required of both a plaintiff and a defendant is ordinary prudence under the circumstances. *Gautreaux v. Scurlock Marine, Inc.*, 405 F. 2d 946, 950 (5th Cir. 1997). While a Jones Act employer has a duty to provide a reasonably safe place to work, the employer must have notice and opportunity to correct an unsafe condition or action. *Colburn v. Bunge Towing, Inc.*, 883 F. 2d 372, 374 (5th Cir. 1989). Duty is measured by the scope of the risk that conduct foreseeably entails. *Gavagan*, 955 F. 2d at 1019 (citing Harper, James & Gray, The Law of Torts (2nd ed. 1986) Vol. 3, § 18 at 655). Drapella argues that the Government was negligent in failing to provide a reasonably safe place to work, failing to maintain and provide proper operating equipment, failure to employ safe procedures to perform the task at hand, not tasking the job to a shore crew with more manpower and better equipment, assigning an unsafe task, failing to properly maintain the D-rings over a long period of time by allowing them to rust solid to the deck in an un-usable configuration, failure to install grease fittings on the D-rings which would have prevented them freezing up and failing to properly supervise on the occasion in question.

---

[1] The Jones Act, 46 U.S.C. § 30104 (2008) incorporates the standards of liability and grants seamen the same rights enjoyed by railway employees under the Federal Employer's Liability Act ("FELA"). *Cox v. Roth*, 348 U.S. 207, 208 (1955). Judicial interpretations of FELA are precedent in Jones Act cases. *See Am. Dredging v. Miller*, 510 U.S. 443, 456 (1994) (citations omitted) ("the Jones Act adopts the entire judicially developed doctrine of liability under FELA."); *Miles v. Apex Marine Corp.*, 498 U.S. 19, 32 (1990) (Congress' incorporation of FELA unaltered into the Jones Act was intended to include the judicial gloss on FELA as well); *Brown v. Parking Drilling Offshort, Corp.*, 410 F. 3d 166, 178 (5th Cir. 2005) ("Jones Act cases follow cases under the FELA.").

The Court concludes that the Government was not negligent in any of these matters for the following reasons:

Failing to provide a reasonably safe place to work; failing to maintain and provide proper operating equipment; failing to employ safe procedures to perform the task at hand; not tasking the job to a shore crew with more manpower and better equipment; and, assigning an unsafe task:

The Court concludes that the Government cannot be held liable for any of the above alleged failures. While an employer must provide a reasonably safe work environment, it must have notice and opportunity to cure any deficiencies. Drapela gave no notice to Brooks that there was any danger in his method of loosening the D-rings nor that other methods might be preferable. Brooks relied upon Drapela's experience and position of responsibility in assigning the task to him and in his failure to second-guess Mr. Drapella's performance of that task. Having had no notice that using the sledgehammer and other tools to loosen the D-rings created an unsafe condition for Drapela, the Government had no opportunity to cure. As bosun, Drapela's job entailed physical labor. He testified that he had used the sledgehammer for other assignments without injury. It was not foreseeable, therefore, that his use of the sledgehammer on this occasion would cause such severe injury.

Failing to properly maintain the D-rings over a long period of time by allowing them to rust solid to the deck in an un-usable configuration:

The Court concludes that even if the Government failed to properly maintain the D-rings over a long period of time, the risk that this failure would lead to Drapela's injuries was not foreseeable.

Failing to install grease fittings on the D-rings which would have prevented them freezing up:

The risk that the D-rings would freeze without grease fittings was foreseeable. The injury

sustained by Drapela in loosening them with the rudimentary instruments with which he proceeded was not. Mr. Drapela's injury did not result from any sort of danger posed by the D-rings. The fact that they needed maintenance did not make them unsafe.

Failing to properly supervise on the occasion in question.

The Court concludes that Brooks did not have a duty to supervise Mr. Drapela to a greater extent than he did on the dates in question. Drapela was an experienced seaman and the bosun of the ship. Nor was evidence presented that any paucity of supervision caused Drapela's injuries.

Finally, because the Government's negligence did not cause Drapela's injuries, it need not consider whether Drapela was contributorily negligent.

**B. Breach of the Duty of Seaworthiness**

The warranty of seaworthiness obligates an owner to furnish a ship, crew, and appurtenances reasonably fit for its intended service, not an accident free ship. *Usner v Luckenback Overseas Corp.*, 400 U.S. 494, 499-500 (1971). A shipowner owes to every member of the crew employed on its vessel the absolute duty to keep and maintain the ship, and all decks and passageways, appliances, gear, tools, parts, and equipment of the vessel in a seaworthy condition at all times. Although the duty of seaworthiness is absolute and does not require negligence, the mere fact that an accident occurred does not establish unseaworthiness. The Fifth Circuit Pattern Jury Instruction on unseaworthiness explains that the duty to provide a seaworthy vessel includes a duty to supply an adequate and competent crew. FIFTH CIRCUIT PATTERN JURY INSTRUCTIONS: CIVIL § 4.5, Committee on Pattern Jury Instructions (2009 rev'n). A vessel may be unseaworthy even though it has a numerically adequate crew if too few persons are assigned a given task. *Id.* The shipowner is not required to provide the best appliances and equipment, or the finest of crews, on his vessel. *Id.* He is only required to provide gear that is reasonably proper and suitable for its intended use, and a crew that is reasonably adequate. *Id.* The Court finds that the Government did not provide an adequate crew of sufficient manpower to perform the tasks required, and that the vessel was unfit

because it had inadequate tools on board to maintain the D-rings on the M/V CAPE VICTORY. The purpose of the M/V/ CAPE VICTORY was to be able to carry cargo for military operations within three days notice that its services were required. The D-rings were necessary to carry any such cargo and in their rusted state, they were completely unfit for that purpose. Nor were the tools on board the ship sufficient to loosen the frozen D-rings within the three day time period. Although the tools were sufficient to loosen one ring at a time, there were over 165 rings on the vessel.

The Court finds that the unseaworthiness of the M/V CAPE VICTORY, as discussed above, was the proximate cause of Mr. Drapela's injuries. "To establish the requisite proximate cause in an unseaworthiness claim, a plaintiff must prove that the unseaworthy condition played a substantial part in bringing about or actually causing the injury and that the injury was either a direct result or a reasonably probable consequence of the unseaworthiness." *Johnson v. Offshore Express, Inc.*, 845 F. 2d 1347, 1354 (5th Cir.), cert. denied, 488 U.S. 968 (1988). Here, the enormity of the task and the inadequacy of the tools caused Drapela's spine injuries.

**D. Damages**

The Court finds that Mr. Drapela is entitled to the following compensatory damages:

| | |
|---|---|
| Total losses from date of accident to date of trial: | **$142,992.00** |
| Future medical expenses: | **$7, 940.00** |
| Net future loss of earnings: | **$281,234.00** (after income tax and discounted to present value) |

No punitive damages were requested or shall be awarded.

## CONCLUSION

Wherefore, it is **ORDERED** that Plaintiff Frank Drapella shall recover $432,166.00 from Defendant.

It is further **ORDERED** that Plaintiff Frank Drapella shall recover post-judgment interest from Defendant at the simple rate of 0.33%, or $3.90 per day, from the date this judgment is entered.

**SO ORDERED.**

**SIGNED** this the **11** day of **February, 2010.**

Thad Heartfield
United States District Judge